UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

_____
The Tea Party Leadership Fund                        )
209 Pennsylvania Ave SE, Suite 2109         )
Washington, DC 20003                                    )
                                                                         )
Mr. John Raese                                                )
The Raese for Senate Committee                    )
PO BOX 262                                                     )
Morgantown, WV 26507                                )
                                                                         )
Mr. Sean Bielat                                              )
Bielat for Congress 2012                                )
PO BOX 1143                                                  )
Brookline, MA 02446                                    )
                                                                         )
                              Plaintiffs,                        )
                                                                         )
              v.                                                       )              Civil Case No. _____
                                                                         )
FEDERAL ELECTION COMMISSION           )
999 E Street, NW                                             )
Washington, DC 20463,                                  )
                                                                         )
                              Defendant.                       )
_____)

_____

**VERIFIED COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF**
_____

Plaintiffs The Tea Party Leadership Fund, Mr. John Raese, and Mr. Sean Bielat bring this

action for declaratory and injunctive relief, and complain as follows:


**INTRODUCTION**

1.      This case challenges laws that, as interpreted and applied by the Federal Election

        Commission, abridge the freedom of speech and association guaranteed under the First

        Amendment to the Constitution.  This challenge is brought facially and as-applied against

the six-month waiting period on political committees making non-corrupting

contributions in amounts of $5,000 per candidate per election, 2 U.S.C. § 441a(a)(4), and

against the $2,500 contribution limit per candidate per election that should no longer

apply to Plaintiffs: 2 U.S.C. § 441a(a)(1)(C). If Plaintiffs are granted this relief, they will

abide by the $15,000 annual contribution limit to political party committees that applies

to multicandidate committees. 2 U.S.C. § 441a(a)(2)(B).

2.     The Tea Party Leadership Fund (or "TPLF") is a non-connected Hybrid PAC whose

registration with the Commission was filed on May 9, 2012, and whose six-month

waiting period is scheduled to end on November 9, or three days after the November 6

elections. 2 U.S.C. § 441a(a)(4).[1] TPLF has made contributions to 11 candidates and

received contributions from at least 6,000 persons to its contribution account and

contributions from more than 100 persons to its *Carey* account. *See Carey v. FEC,* 791 F.

Supp. 2d 121 (D.D.C. 2011).

3.     Mr. John Raese is the 2012 Republican candidate for the United States Senate from West

Virginia. As a challenger, he is interested in associating politically with like-minded

contributors to the full extent of the law.

4.     Mr. Sean Bielat is the 2012 Republican challenger for the House of Representatives from

Massachusetts' Fourth congressional district. He is equally interested in associating

politically with like-minded contributors to the full extent of the law.

5.     The Tea Party Leadership Fund has already contributed $2,500 each to Mr. Raese and

Mr. Bielat, and wishes to contribute an additional $2,500 to each, as well as contribute to

---

[1] These claims will retain standing after November 9, 2012, because the TPLF challenges this law as substantially overbroad, *see Broadrick v. Oklahoma,* 413 U.S. 601 (1973), on behalf of all similarly situated political committees, and the matter of not meeting the six-month waiting period before desiring to make increased contributions to candidates is capable of repetition yet evades review. *Southern Pacific Terminal Co., v. ICC,* 219 U.S. 498 (1911)

other candidates in amounts approaching $5,000 per election, and wonders why it must wait six months to do so. *See* 2 U.S.C. § 441a(a)(2)(A); (a)(4).

6. In 1974, Congress defined the term "'political committee' [to] mean[] an organization registered as a political committee under section 303 of the Federal Election Campaign Act of 1971 for a period of not less than 6 months, which has received contributions from more than 50 persons and, except for any State political party organization, has made contributions to 5 or more candidates for Federal office." Federal Election Campaign Act Amendments of 1974, § 101(b)(2), Pub. L. 93-443, 88 Stat. 1263, 1275-76 (Oct. 15, 1974).

7. At that time, no individual could make a contribution in excess of $1,000 to any candidate per election, and there was an aggregate contribution limit to any and all candidates and political committees of $25,000 per calendar year. *Id.* at 1276, § 101(b)(3). The 1974 Amendments also instituted a $5,000 contribution limit per candidate per election from PACs and party committees, with no aggregate limit on the amount PACs and party committees could contribute to all candidates. *Id.* at 1275; § 101 (b)(2).

8. The *Buckley* Court reviewed the six-month waiting period in 1975, issuing its opinion in early 1976. 424 U.S. 1 (1976): "Section 608(b)(2) permits certain committees, designated as "political committees," to contribute up to $5,000 to any candidate with respect to any election for federal office. In order to qualify for the higher contribution ceiling, a group must have been registered with the Commission as a political committee under 2 U.S.C. § 433 (1970 ed., Supp. IV) for not less than six months, have received contributions from

more than 50 persons, and, except for state political party organizations, have contributed to five or more candidates for federal office." 424 U.S. at 35.

9.    The Court held that the six-month limit exists to prevent circumvention of the base contribution limit to candidates: "Appellants argue that these qualifications unconstitutionally discriminate against *ad hoc* organizations in favor of established interest groups and impermissibly burden free association. The argument is without merit.  Rather than undermining freedom of association, the basic provision enhances the opportunity of *bona fide* groups to participate in the election process, and the registration, contribution, and candidate conditions serve the permissible purpose of *preventing individuals from evading the applicable contribution limitations by labeling themselves committees*." 424 U. S. at 35-36 (emphasis added).

10.    In 1976, however, as a response to the Court's opinion in *Buckley v. Valeo*, Congress took other means to prevent individuals from labeling themselves committees. First, Congress enacted a*dditional* contribution limits. The 1976 Amendments to the Act prohibited individuals from contributing more than $5,000 to a PAC and limited multicandidate committees to contributing $15,000 per year to a national party committee. Federal Election Campaign Act Amendments of 1976, Pub. L. 94-283, Title I, 90 Stat. 486 (May 11, 1976).

11.    What is more, the Amendments enacted the so-called nonproliferation provisions, a prophylactic to prevent circumvention of the base contribution limits under federal campaign law. *Id.* All PACs sponsored by the same individual or organization would be treated as "affiliated" and held to a single contribution limit. *Id;* 2 U.S.C. § 441a(a)(5)

(affiliated committees—those established, financed, maintained or controlled by the same person or groups of persons—share a contribution limit).

12.    The 1976 Amendments had a profound effect by preventing wealthy contributors from funneling, short of illegal earmarking (*see* 2 U.S.C. §§ 441a(a)(8) and 441f), candidate contributions above the base limits Congress had already determined pose no cognizable threat of corruption. *See generally*, 2 U.S.C. §§ 441a(a)(1) and (2).

13.    The six-month waiting period enacted in 1974 had, by 1977, become a "prophyla[ctic]-upon-prophylaxis," *see FEC v. Wisc. Rt. to Life, Inc.*, 551 U.S. 449, 478-79 (2007), rendering it useless to the prevention of corruption or circumvention, and serving little purpose other than as an intolerable prior restraint.

14.    The Federal Election Commission ("Commission") failed to grant an affirmative response to plaintiffs' advisory opinion request, which sought a declaration that TPLF's desire to make contributions to candidates in amounts greater than $2,500, but less than $5,000, per election until the running of a six-month waiting period would be lawful.

15.    Because of this, Messrs. Raese and Bielat are presently stymied in their ability to accept additional contributions from TPLF in the ongoing 2012 election cycle.

16.    In failing to permit plaintiffs to associate politically up to the non-corrupting limit of $5,000 per election, the Commission has infringed upon the constitutionally-protected rights of plaintiffs, and the Commission has caused and continues to cause injury by forcing plaintiffs to seek judicial relief to associate and speak freely.

17.    Other political committees registered with the Commission, who have received contributions from 50 or more persons and made contributions to five or more federal candidates, *see* 2 U.S.C. 441a(a)(4), should be relieved of the burden of this six-month

waiting period as well. The provision can no longer meet applicable standards of scrutiny, for it no longer prevents the corruption of candidates or circumvention of the base contribution limits to candidates. Therefore, the six-month waiting period is substantially overbroad under *Broadrick v. Oklahoma,* 413 U.S. 601 (1973).

## JURISDICTION AND VENUE

18.    This Court has jurisdiction over this case pursuant to 28 U.S.C. §§ 1331 and 2201 as a challenge arising under the First Amendment to the Constitution of the United States, the Federal Election Campaign Act, and the Declaratory Judgment Act, 28 U.S.C. §§ 2201-02.

19.    Venue is proper in this Court under 28 U.S.C. §1391(e) because Defendant is an entity of the United States Government.

## PARTIES

20.    The Tea Party Leadership Fund is a non-connected Hybrid PAC whose registration with the Commission was filed on May 9, 2012. It has made contributions to 11 candidates and has received contributions from at least 6,000 persons to its contribution account and contributions from more than 100 persons to its *Carey* account. *See Carey v. FEC,* 791 F. Supp. 2d 121 (D.D.C. 2011).

21.    Mr. John Raese is the 2012 Republican challenger for the United States Senate from West Virginia.

22.    Mr. Sean Bielat is the 2012 Republican challenger for the House of Representatives from Massachusetts' Fourth congressional district.

23.     The Commission is the federal agency charged with enforcement of the Federal Election

        Campaign Act ("Act") and is located in Washington, D.C.

## STATEMENT OF FACTS

24.     The Tea Party Leadership Fund is a non-connected Hybrid PAC whose registration with

        the Commission was filed on May 9, 2012. It has made contributions to 11 candidates

        and received contributions from at least 6,000 persons to its contribution account and

        contributions from more than 100 persons to its *Carey* account. *See Carey v. FEC,* 791 F.

        Supp. 2d 121 (D.D.C. 2011).

25.     Mr. John Raese is the 2012 Republican candidate for the United States Senate from West

        Virginia. As a challenger, he is interested in associating politically with like-minded

        contributors to the full extent of the law.

26.     Similarly, Mr. Sean Bielat is the 2012 Republican challenger for the House of

        Representatives from Massachusetts' Fourth congressional district. He is equally

        interested in associating politically with like-minded contributors to the full extent of the

        law.

27.     The Tea Party Leadership Fund has already contributed $2,500 each to Mr. Raese and

        Mr. Bielat, and wishes to contribute an additional $2,500 to each, as well as to other

        candidates, in amounts approaching $5,000 per election, and wonders whether it must

        wait six months to do so. *See* 2 U.S.C. § 441a(a)(2)(A).

28.     The Act's contribution limits "operate in an area of the most fundamental First

        Amendment activities" and the protections provided by that "'constitutional guarantee

ha[ve their] fullest and most urgent application precisely to the conduct of campaigns for political office.'" *Buckley v. Valeo,* 424 U.S. 1, 14-15 (internal citations omitted).

29.   It is equally true that the First Amendment protects political association and "[g]overnmental action which may have the effect of curtailing the freedom to associate is subject to the closest scrutiny." *NAACP v. Alabama ex. rel. Patterson,* 357 U.S. 449, 461-62 (1958).

30.   In 1974, Congress defined the term "'political committee' [to] mean[] an organization registered as a political committee under section 303 of the Federal Election Campaign Act of 1971 for a period of not less than 6 months, which has received contributions from more than 50 persons and, except for any State political party organization, has made contributions to 5 or more candidates for Federal office." Federal Election Campaign Act Amendments of 1974, § 101(b)(2), Pub. L. 93-443, 88 Stat. 1263, 1275-76 (Oct. 15, 1974).

31.   At that time, no individual could make a contribution in excess of $1,000 to any candidate per election, and there was an aggregate contribution limit to any and all candidates and political committees of $25,000 per calendar year. *Id.* at 1276, § 101(b)(3). The 1974 Amendments also instituted a $5,000 contribution limit per candidate per election for PACs and party committees, with no aggregate limit on the amount PACs and party committees could contribute to all candidates. *Id.* at 1275; § 101 (b)(2).

32.   The *Buckley* Court reviewed the six-month waiting period in 1975, issuing its opinion in early 1976. 424 U.S. 1 (1976).

Section 608(b)(2) permits certain committees, designated as "political committees," to contribute up to $5,000 to any candidate with respect to any

election for federal office. In order to qualify for the higher contribution ceiling, a group must have been registered with the Commission as a political committee under 2 U.S.C. § 433 (1970 ed., Supp. IV) for not less than six months, have received contributions from more than 50 persons, and, except for state political party organizations, have contributed to five or more candidates for federal office.

424 U.S. at 35.

33.     The Court held that the six-month limit exists to prevent circumvention of the base

contribution limit to candidates:

Appellants argue that these qualifications unconstitutionally discriminate against *ad hoc* organizations in favor of established interest groups and impermissibly burden free association. The argument is without merit.  Rather than undermining freedom of association, the basic provision enhances the opportunity of *bona fide* groups to participate in the election process, and the registration, contribution, and candidate conditions serve the permissible purpose of *preventing individuals from evading the applicable contribution limitations by labeling themselves committees*.

424 U. S. at 35-36 (emphasis added).

34.     In 1976, however, as a response to the Court's opinion in *Buckley v. Valeo*, Congress

enacted a*dditional* contribution limits. The 1976 Amendments to the Act prohibited

individuals from contributing more than $5,000 to a PAC and limited multicandidate

committees to contributing $15,000 per year to a national party committee. Federal

Election Campaign Act Amendments of 1976, Pub. L. 94-283, Title I, 90 Stat. 486 (May

11, 1976).

35.      What is more, the Amendments enacted the so-called nonproliferation provisions, a

prophylactic to prevent circumvention of the base contribution limits under federal

campaign law. *Id.* All PACs sponsored by the same organization would be treated as

"affiliated" and held to a single contribution limit. *Id.*

36.     To understand how the law would have worked in practical terms at the time the *Buckley*

Court issued its landmark opinion, before the 1976 Amendments, consider this scenario.

A wealthy individual who wanted to pour all of his resources into helping one

congressional candidate could have given—in the two-year period that comprises an

election cycle—$2,000 directly to the candidate ($1,000 in each of the primary and

general elections) then contributed $10,000 ($5,000 per year) to four PACs that he

created. Those PACs would, in turn, contribute $5,000 per election to the candidate. This

individual still could have created a fifth PAC that could accept his remaining $8,000

($5,000 in year one; $3,000 in year two) to reach the individual's overall aggregate limit

of $50,000 in a two-year election cycle ($25,000 per calendar year with two calendar

years in each election cycle). Under the Act *Buckley* reviewed, it was fairly easy for one

individual to lavish $50,000 on one candidate during an election cycle.

37.     Note, however, how impossible that scenario had become by 1977. The individual still

could have given $2,000 to a congressional candidate directly ($1,000 per election,

primary and general). But no matter how many PACs the individual established those

PACs could not give any more than an aggregate of $5,000 per candidate per election

under the anti-proliferation rules. *See* 2 U.S.C. § 441a(a)(5) (affiliated committees all

share one contribution limit).  By the year 1977, the requirement that 50 persons

contribute to the PAC ensures that the PAC is not wholly controlled by one person, and

the requirement that the PAC contribute to 5 or more candidates ensures that the PAC is

not established to shower support on a single candidate. 2 U.S.C. § 441a(a)(4). But after

these requirements are met, there is no reason to make the PAC wait six months to

contribute $5,000 per candidate per election. *Id.*

38.     The 1976 Amendments had a profound effect by preventing wealthy contributors from

        funneling, short of illegal earmarking, candidate contributions above the base limits

        Congress had already determined pose no cognizable threat of corruption. See generally 2

        U.S.C. §§ 441a(a)(1) and (2).

39.     The six-month waiting period enacted in 1974 had, by 1977, become a "prophyla[ctic]-

        upon-prophylaxis," *see FEC v. Wisc. Rt. to Life, Inc.,* 551 U.S. 449, 478-79 (2007),

        rendering it useless to the prevention of corruption or circumvention, and serving little

        purpose other than as an intolerable prior restraint.

40.     Even if, as *Buckley* held, *"[a]* contribution serves as a general expression of support for

        the candidate and his views, but does not communicate the underlying basis for the

        support," 424 U.S. at 21, under exacting scrutiny, there is a no-broader-than-necessary

        tailoring requirement. The controlling opinion in *California Medical Association v. FEC,*

        453 U.S. 182 (1981) (*CalMed*), requires "that contributions to political committees can

        only be limited if those contributions implicate the governmental interest in preventing

        actual or potential corruption [of candidates], and if the limitation is no broader than

        necessary to achieve that interest." *Id.* at 203 (Blackmun, J., concurring in part and in the

        judgment). This reaffirms *Buckley's* requirement that "[a] restriction that is closely drawn

        must nonetheless 'avoid unnecessary abridgement of associational freedoms.'" *Wagner v.

        FEC,* No. 11-1841, 2012 WL 1255145, at *6 (D.D.C. Apr. 16, 2012) (quoting *Buckley v.

        Valeo,* 424 U.S. at 25).

41.     The six-month waiting period is no longer closely drawn to prevent actual or potential

        corruption after Congress' enactment of the 1976 Amendments. Indeed, it has become

        little more than an intolerable prior restraint.

42.     The United States Supreme Court has made clear that prior restraints—laws requiring

permits, licenses, waiting periods or other official permission to speak—are particularly

suspect. "Any system of prior restraints of expression comes to this Court bearing a

heavy presumption against its constitutional validity." *Bantam Books, Inc. v. Sullivan,*

372 U.S. 58, 70 (1963). While a political committee is not required to obtain a permit or

license, the waiting period of 2 U.S.C. § 441a(4)(a) is functionally and legally identical to

licensing laws in that they delay proposed speech activity while the speaker jumps

through bureaucratic hoops.

43.     In *Thomas v. Collins,* the Supreme Court stated that "[a]s a matter of principle a

requirement of registration in order to make a public speech would seem generally

incompatible with an exercise of the rights of free speech and assembly." 323 U.S. 516,

539 (1945). The Court applied this principle in a recent case, holding that even purely

ministerial restrictions may not be imposed as a precondition to speech. *See Watchtower

Bible & Tract Soc'y of N.Y., Inc. v. Vill. of Stratton,* 536 U.S. 150 (2002).

44.     In *Watchtower Bible*, the Court considered a town ordinance that required door-to-door

canvassers to register and obtain a permit before calling on residents at their homes. *Id.* at

165. The law was challenged by a Jehovah's Witness group that planned to distribute

pamphlets. While noting that the ordinance was generally applicable, the Court found its

application to religious and political causes problematic. *Id.* at 165. Thus, even though

the permits were free and had apparently never been refused, the Court struck down the

requirement as a prior restraint. The Court stated:  "Even if the issuance of permits…is a

ministerial task…a law requiring a permit to engage in such speech constitutes a dramatic

departure from our national heritage and constitutional tradition." *Id.* at 165-66. The

Court made special note of the fact that a registration requirement bans spontaneous speech.

45.     *Thomas* and *Watchtower Bible* illustrate that simply requiring free and purely informational registration with the State before making a meaningful contribution is an unconstitutional prior restraint, in part because it burdens "spontaneous speech." *Cf. Watchtower Bible,* 536 U.S. at 167. The Supreme Court struck the registration requirement in *Watchtower Bible*, despite acknowledging that it was generally applicable and seemed to be directed at preventing fraud.

46.     Registering with the Commission and waiting for six months to pass before a political committee can contribute $5,000 per election to a candidate is a prior restraint that does nothing to prevent corruption.  In this particular instance, The Tea Party Leadership Fund has thousands of mostly small dollar donors and an average contribution of less than $40, and only 5 contributions of $1,000.

47.     The six month period will have run mere days after the election, forever depriving the requestors and the thousands of individuals who contribute to The Tea Party Leadership Fund their right to association and speech.

48.     It is true under federal law that only after a group of individuals accepts or spends $1,000 and demonstrates a major purpose of campaign activity, *see Buckley,* 424 U.S. at 79, must the group register with the Commission, and they have ten days after crossing the threshold to do so. 11 CFR 102.1(d). But the requirement that a political committee register with the Commission and be required to wait an additional six months to make a $5,000 contribution to a candidate is a prior restraint on speech unjustified by an important or compelling government interest when the group has amply established (by

receiving contributions from vastly more than 50 persons and making contributions to more than 5 candidates) that it is indeed a committee making contributions on behalf of a great many persons.

49.    What is more, the Commission should have no concern in allowing The Tea Party Leadership Fund to contribute to candidates in the non-corrupting amounts available to any multicandidate committee. To paraphrase the Supreme Court in *Davis v. FEC*, "[G]iven Congress' judgment that liberalized limits for [multicandidate committees] do not unduly imperil anticorruption interests, it is hard to imagine how the denial of liberalized limits to [groups who have yet to wait six months] can be regarded as serving anticorruption goals sufficiently to justify the resulting constitutional burden." *Davis v. FEC,* 554 U.S. 724, 741 (2008).

50.    TPLF's inability to make these contributions, and Messrs. Raese and Bielat's inability to accept them, has caused and continues to cause ongoing injuries to the would-be speakers before this court.

### *The Advisory Opinion Request*

51.    On September 17, 2012, The Tea Party Leadership Fund and Messrs. Raese and Bielat submitted an advisory opinion request ("AOR"), attached as EXHIBIT A, to the Commission pursuant to 2 U.S.C. § 437f(a)(2).  ELF's AOR asked:

    a.      *May Tea Party Leadership Fund make contributions to candidates of up to $5,000 per election before the six-month period of 2 U.S.C § 441a(a)(4)has run?*

    b.      *May Messrs. Raese and Bielat accept contributions above $2500, but less than $5000, per election from TPLF before the six-month waiting period has run?*

52.    Pursuant to 11 C.F.R. § 112.1, the Commission accepted the AOR for review, assigned it
       AOR number 2012-32, and posted it on the Commission's website for public
       commentary.

53.    On October 3, 2012, the Commission's general counsel issued a draft advisory opinion
       that failed to approve Plaintiff's plans. This "Draft " advisory opinion is included as
       EXHIBIT B.

54.    On October 4, 2012, at an open meeting of the Commission, the Commission discussed
       the AOR and resolved to handle the matter by tally vote.

55.    Pursuant to 11 C.F.R. § 112.4(a), the Commission certified on October 10, 2012 that it
       was unable to approve TPLF's AOR because it lacked the necessary four votes.  *See
       generally* 2 U.S.C. §§ 437g(a)(2), (a)(4)(C) and (a)(6)(A). *See* Certification of Shaun
       Whitehead Werth, dated October 10, 2012, attached as Exhibit C.

56.    The Commission's failure to affirmatively provide a four-vote, binding advisory opinion
       in response to plaintiffs' request carries the equivalent legal effect that its proposed
       actions would be invalid under the Act and subject the organization to civil or criminal
       penalties under 2 U.S.C. § 437g for speaking out about candidates and otherwise
       engaging in political association.

57.    The Commission's refusal to issue an advisory opinion deprives plaintiffs of a legal
       reliance defense that they could otherwise receive under 2 U.S.C. § 437f(c).  The
       advisory opinion process in this matter is complete and deprived plaintiffs of a legal right
       – to engage freely in constitutionally protected speech and association.  *See Unity 08 v.
       Federal Election Commission*, 596 F.3d 861 (D.C. Cir. 2010) ("parties are commonly not
       required to violate an agency's legal position and risk an enforcement proceeding before

they may seek judicial review"); *see also Democratic Senatorial Campaign Committee v. Federal Election Commission*, 918 F. Supp. 1 (D.D.C. 1994).

### Ensuing Harm to Plaintiffs

58. At the time of filing the advisory opinion request, the general election was less than 60 days away.  Messrs. Raese and Bielat and TPLF filed their request as promptly as possible to ensure that their planned speech and association would be deemed lawful under the Act and related regulations.   Because the Commission could not approve Plaintiffs' planned actions, TPLF was required to curtail its contributions during the 2012 primary election cycle.

59. During the 2012 election cycle, TPLF planned to make contributions to those candidates who reflect the values of TPLF, including among others Senate challenger John Raese and Congressional challenger Sean Bielat. While TPLF was free to endorse its preferred candidates, section 441a(a)(4) curtailed the size of the contributions TPLF could make. Because the FEC did not permit TPLF to make $5,000 contributions to candidates Raese and Bielat, TPLF has been unable to associate with these and other candidates to the level rightly seen as non-corrupting under federal law. 2 U.S.C. § 441a(a)(2)(A).

### Ongoing Harm to Plaintiffs

60. As soon as possible, and certainly before the 2012 general election, TPLF would like to make contributions to federal candidates in amounts approaching $5,000 per election. Without the ability to make such contributions, TPLF will be damaged in its ability to associate fully with the candidates of its choosing during the 2012 electoral season. Without an immediate ruling from this court, TPLF will not possess the necessary time to make these contributions.

61.    As soon as possible, and certainly before the 2012 primary and general elections,

Plaintiffs John Raese and Sean Bielat would like to accept contributions from TPLF in

amounts of up to $5,000 per election.

*TPLF's Operations*

62.    TPLF has not made contributions to candidates of greater than $2,500 per election,

although it would like to make contributions up to the $5,000 limit at 2 U.S.C. §

441a(a)(2)(A).

63.    TPLF will face a credible threat of prosecution if it makes contributions to any candidate

in excess of the limits contained in 2 U.S.C. §§441a(a)(1)(C).

64.    John Raese has not yet solicited or accepted any contributions from TPLF in excess of

the $2,500 limit imposed by 2 U.S.C. § 441a(a)(1)(C), because doing so would subject

him to civil and criminal penalties.  2 U.S.C. § 437g(d).

65.    Sean Bielat has not yet solicited or accepted any contributions from TPLF in excess of

the $2,500 limit imposed by 2 U.S.C. § 441a(a)(1)(C), because doing so would subject

him to civil and criminal penalties.  2 U.S.C. § 437g(d).

**COUNT 1**
**Six-Month Waiting Period—All Plaintiffs**

66.    Plaintiffs re-allege and incorporate by reference all of the allegations contained in all of

the preceding paragraphs.

67.    TPLF would like to make additional contributions in the future to federal candidates as

described herein and as may arise in future circumstances. *See* 2 U.S.C. § 441a(a)(2)(A)

68.    Application of the six-month waiting period at 2 U.S.C. § 441a(a)(4) to TPLF severely

burdens its rights to speak and associate with other candidates while doing nothing to

prevent corruption of candidates or the circumvention of the base contribution limits to candidates.

69.     The application of the six-month waiting period in 2 U.S.C. § 441a(a)(4) severely burdens Plaintiffs Raese and Bielat's rights to freedom of speech and association under the First Amendment while doing nothing to prevent their corruption.

70.     The application of the six-month waiting period at 2 U.S.C. § 441a(a)(4) to political committees that have received 50 or more contributions and made contributions to five or more candidates burdens their rights to speak and associate with other candidates while doing nothing to prevent corruption of candidates or the circumvention of the base contribution limits to candidates.

## COUNT 2
## Contribution Limits — All Plaintiffs

71.     Plaintiffs re-allege and incorporate by reference all of the allegations contained in all of the preceding paragraphs.

72.     TPLF would like to make additional contributions to federal candidates as described herein and as may arise in future circumstances. The application of the contribution limits at 2 U.S.C. § 441a(a)(1)(C) ($2,500 per candidate per election), to TPLF's contributions severely burdens its right to freedom of speech and association without furthering the government's interest in preventing corruption or circumventing the base contribution limits to candidates.

73.     TPLF is ready, willing, and able to contribute up to $5,000 per candidate per election. *See* 2 U.S.C. § 441a(a)(2)(A).

74.    The application of the contribution limits at 2 U.S.C. § 441a(a)(1)(C) (and the six-month

       waiting period at § 441a(a)(4)) to TPLF's contributions severely burden its right to

       associate with candidates by placing constitutionally unjustified limits on how much

       money it may contribute to likeminded candidates.

75.    TPLF's contributions present no threat or appearance of corruption because all of its

       contributions to candidates will be made from a traditional account comprised of funds

       received from individuals in amounts of $5,000 or less.

76.    The application of contribution limits contained in 2 U.S.C. §§ 441a(a)(1)(C) and

       441a(a)(3) to TPLF violates Plaintiffs' rights to freedom of speech and association under

       the First Amendment.  By denying TPLF's recipients the meaningful ability to associate

       through the act of contributing in furtherance of their political ideas, Plaintiffs'

       constitutional rights are abridged.


## PRAYER FOR RELIEF

       Wherefore, Plaintiff prays for the following relief:

77.    A declaratory judgment that the six-month waiting period on making contributions up to

       $5,000 per election in 2 U.S.C. § 441a(a)(4) is unconstitutional as applied to

       contributions made by TPLF to candidates for federal office;

78.    A declaratory judgment that the six-month waiting period on TPLF making contributions

       to candidates of up to $5,000 per candidate per election is unconstitutional as applied to

       the contributions that would be received by Plaintiffs Raese and Bielat;

79.   A declaratory judgment that the contribution limits contained in 2 U.S.C. §
      441a(a)(1)(C), as well as any applicable rules and regulations regarding these provisions,
      are unconstitutional as-applied to TPLF;

80.   A declaratory judgment that the contribution limits contained in 2 U.S.C. §
      441a(a)(1)(C), as well as applicable rules and regulations regarding those provisions, are
      unconstitutional as applied to the contributions TPLF would make to Plaintiffs Raese and
      Bielat as described herein;

81.   A declaratory judgment that the six-month waiting period at 2 U.S.C. § 441a(a)(4) is
      unconstitutional on its face for any political committee registered with the Commission
      that has received contributions from at least 50 persons and has made contributions to
      five or more candidates. *Cf.* 2 U.S.C. § 441a(a)(4);

82.   Preliminary and permanent injunctions enjoining Defendant FEC from enforcing §§
      441a(a)(1)(C) as described in this complaint, as well as any applicable rules and
      regulations regarding those provisions, against the contributions Messrs. Raese and Bielat
      would receive from TPLF.

83.   Preliminary and permanent injunctions enjoining Defendant FEC from enforcing §§
      441a(a)(1)(C)  and 441a(a)(4) as described in this complaint, as well as any applicable
      rules and regulations regarding those provisions, against TPLF;

84.   Preliminary and permanent injunctions enjoining Defendant FEC from enforcing 2
      U.S.C. §§ 441a(a)(1)(C) and 441a(a)(4) as described in this complaint, against any
      political committee registered with the Commission that has received contributions from
      at least 50 persons and has made contributions to at least five candidates. *Cf.* 2 U.S.C. §
      441a(a)(4);

85.    An award of nominal damages of $1 for the violation of Plaintiffs' constitutional rights;

86.    Costs and attorneys' fees pursuant to any applicable statute or authority;

87.    Any other relief that the Court deems just and appropriate.

Date this _____ day of October, 2012.

<div style="margin-left:40%">

Respectfully submitted


Stephen M. Hoersting*


_____/s/_____

Dan Backer (D.C. Bar No. 996641)
DB CAPITOL STRATEGIES, PLLC
209 Pennsylvania Ave. SE, Suite 2109
Washington, DC 20003
937.623.6102
202.210.5431
shoersting@dbcapitolstrategies.com
dbacker@dbcapitolstrategies.com

*Attorneys for Plaintiffs*

*Motions for *Pro Hac Vice* to be filed.

</div>

## **VERIFICATION**

I, Dan Backer, declare as follows:

1. My name is Dan Backer.

2. I am the Treasurer of The Tea Party Leadership Fund PAC.

3. I have personal knowledge of the operations of The Tea Party Leadership Fund, including those set out in this Complaint, and if called upon to testify I would testify competently as to matters stated herein.

4. I verify under penalty of perjury under the laws of the United States of America that the factual statements in this Complaint concerning The Tea Party Leadership Fund are true and correct.

Executed on October 16, 2012.

Dan Backer

**VERIFICATION**

I, John Raese, declare as follows:

1. My name is John Raese.

2. I am the 2012 Republican challenger for the United States Senate for the State of West Virginia.

3. I am not a Member of The Tea Party Leadership Fund.

4. I would like to receive contributions from The Tea Party Leadership Fund of amounts up to $5,000 per election for the 2012 general election. I have personal knowledge of the operations of my Senate campaign, including those set out in this Complaint, and if called upon to testify I would testify competently as to matters stated herein.

5. I verify under penalty of perjury under the laws of the United States of America that the factual statements in this Complaint concerning me and Senate campaign are true and correct.

Executed on October 17, 2012.

John Raese

# VERIFICATION

I, Sean Bielat, declare as follows:

1.  My name is Sean Bielat.

2.  I am the 2012 Republican challenger for the United States House of Representatives for the Fourth Congressional District of the State of Massachusetts.

3.  I am not a Member of The Tea Party Leadership Fund.

4.  I would like to receive contributions from The Tea Party Leadership Fund in amounts up to $5,000 per election for the 2012 general election. I have personal knowledge of the operations of my Congressional campaign, including those set out in this Complaint, and if called upon to testify I would testify competently as to matters stated herein.

5.  I verify under penalty of perjury under the laws of the United States of America that the factual statements in this Complaint concerning me and Congressional campaign are true and correct.

Executed on October 16, 2012.


_____
Sean Bielat